```
1                   IN THE UNITED STATES DISTRICT COURT
                     FOR THE SOUTHERN DISTRICT OF TEXAS
2                              HOUSTON DIVISION

3

   HUMBLE SURGICAL HOSPITAL, LLC,    )
4                                    )
              Plaintiff,             )
5                                    )   NO. H-14-CV-3177
   v.                                )   January 8, 2015
6                                    )
   AETNA LIFE INSURANCE COMPANY,     )
7  et al.,                           )
                                     )
8             Defendants.

9

10

11                         INITIAL CONFERENCE
                  BEFORE THE HONORABLE LYNN N. HUGHES
12

13

14

15

16   For the Plaintiff:         Jack O'Neill
                                Brian J. Cathey
17                              Scott R. Humphrey
                                Pierce & O'Neill, LLP
18                              4203 Montrose Blvd.
                                Houston, TX  77006
19
     For Defendant Aetna:       John B. Shely
20                              Dena Palermo
                                Brian C. Pidcock
21                              Andrews Kurth, LLP
                                600 Travis, Suite 4200
22                              Houston, Texas 77002

23   For Defendants Entergy     Derek S. Davis
     Corporation and            Cooper & Scully, PC
24   ExxonMobil Corporation:    900 Jackson, Suite 100
                                Dallas, TX  75202
25
```

```
 1    For Defendant HCA, Inc.:     Randall A. Constantine
                                   Mazursky Constantine, LLC
 2                                 999 Peachtree Road, Suite 1500
                                   Atlanta, GA   30309
 3
                                   Kathryn Semmler
 4                                 Akin Gump
                                   1111 Louisiana, 44th Floor
 5                                 Houston, TX   77002

 6    Court Reporter:             Bruce Slavin, RPR, CM

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
      Proceedings reported by mechanical stenography and produced
25    by computer-aided transcription.
```

```
 1              THE COURT:  Thank you.  Good morning.
 2              MR. SHELY:  Good morning, Judge.
 3              MS. PALERMO:  Good morning, Judge.
 4              THE COURT:  Mr. O'Neill, it was not clear to me
 5    from the complaint.  Does Humble Surgical intend by this
 6    complaint to sue the sponsor and the plan?
 7              MR. O'NEILL:  I'm sorry, Your Honor.  I didn't hear
 8    you.
 9              THE COURT:  Does Humble Surgical, by this
10    complaint, intend to sue the sponsors and the plans?
11              MR. O'NEILL:  Your Honor, it's our understanding
12    that -- Yes.  The answer to your question is "Correct".
13              THE COURT:  So, there are 48 parties instead of 24.
14              MR. O'NEILL:  I think there are 22 or 23, Your
15    Honor.
16              THE COURT:  And what is the nature of the claim
17    that Humble has against the sponsor?
18              MR. O'NEILL:  Your Honor, it's my understanding
19    that -- First of all, all of the claims that are brought in
20    this lawsuit relate to what the Hospital views as a virtual
21    nonpayment of claims since October 25th -- actually, going
22    back a little bit further than that -- October the 25th of
23    2013.  It is my --
24              THE COURT:  I am painfully aware of the foreground
25    in this case.
```

09:36 (line 5)
09:36 (line 10)
09:37 (line 15)
09:37 (line 20)
09:37 (line 25)

1      MR. O'NEILL:  It's my --

2              (Simultaneous dialogue)

3      THE COURT:  -- 2013 nothing but ERISA cases and way

4  too many of them involve Mr. Shely.

09:38  5      MR. O'NEILL:  Your Honor, let me just stop and say

6  I apologize.  It's me.  It's not you.  I am hard of hearing.

7  But something about the acoustics in here; I am really

8  having a hard time hearing you.  I apologize.

9      THE COURT:  There is a background noise, which I

09:38  10  don't know what it is or I'd tell somebody to stop it.

11      MR. O'NEILL:  Well, I drove a concrete truck when I

12  was in college and that kind of ruined my hearing.  So, I

13  apologize.

14      THE COURT:  Well, that is an honorable way to lose

09:38  15  your hearing.  Some grown people probably can't hear from

16  disco music and some of the other ones.  I don't know what

17  you call that stuff.

18      MR. O'NEILL:  I don't think that would help.

19              (Off-the-record commentary)

09:38  20      THE COURT:  What is the nature of the claim that

21  Humble has against the sponsors?

22      MR. O'NEILL:  Well, these are -- As I am sure Your

23  Honor knows, there are fully insured plans and there are

24  self-insured plans.  We have self-insured --

09:39  25      THE COURT:  It doesn't matter.  The question is --

1    How the sponsor chooses to sponsor it, whether they use a

2    financial intermediary or fund it themselves, is irrelevant.

3         MR. O'NEILL:  Your Honor, it's my understanding

4    that there is joint and several liability of both Aetna and

09:40  5    the plans and the sponsors.

6         THE COURT:  No.

7         MR. O'NEILL:  Mr. Cathey is more familiar with that

8    than I am.

9         THE COURT:  A claim for plan benefits -- that's

09:40  10   what we have here, right? --

11        MR. O'NEILL:  Yes.

12        THE COURT:  -- is only directed under the

13   statute -- which last year was 40 years old(?) -- is

14   addressed to the plan, not to the sponsor, not to the

09:40  15   participant, not to the beneficiary.  To the plan.

16            Are you going to sue the participant if it is

17   a partially participant-funded plan?

18        MR. O'NEILL:  Your Honor, I'm not going -- I hope

19   you know me well enough to know I'm not going to stand here

09:41  20   and pretend to know something I don't know.  Mr. Humphrey or

21   Mr. Cathey is more -- I think, can answer your question

22   better than I can.

23        THE COURT:  All right.

24        MR. CATHEY:  Yes, Your Honor.

09:41  25        MR. O'NEILL:  Brian, do you want to come up.

1          Your Honor, with the Court's permission, may

2     he approach?

3          THE COURT:  Sure.

4          MR. CATHEY:  Your Honor, we haven't had a chance to

09:41  5     reveal the plan --

6          THE COURT:  Wait a minute.  Move the microphone up

7     a little bit.

8          MR. CATHEY:  We haven't had a chance to -- we

9     haven't obtained copies of all the plans, but, as we

09:41  10    understand it --

11         THE COURT:  I'm sorry.  I am asking you a

12    fundamental statutory question.

13         MR. CATHEY:  Yes, sir.  Under the binding Fifth

14    Circuit precedent --

09:41  15        THE COURT:  I am asking you a statutory question,

16    not a footnote question, counsel.

17         MR. CATHEY:  Okay.

18         THE COURT:  And precedent is not binding unless

19    it's the same parties on the same facts.

09:41  20         You were on the *Law Review*, weren't you?

21         MR. CATHEY:  I was on a journal.

22         THE COURT:  And that's a distinction that people

23    who are on the *Review* love to make, and it's like saying

24    that I was the first clown and not the second clown in the

09:42  25    circus.

1    Counsel, the statute has its own words.

2    MR. CATHEY:  Yes, sir.  And it does -- You are

3  correct, Your Honor, that it does make the plan --

4    THE COURT:  I have been practicing law, probably,

09:42  5  as Mr. O'Neill, longer that there's been ERISA.  It's one of

6  those things that disrupted a fairly decent practice by

7  making me learn a whole new field of law.

8    It says the plan is the obligor and claims for

9  benefits are addressed to the plan.  That will be the ruling

09:42  10  of this court.

11    The statute has not been amended.  Whether you

12  think it's a conspiracy to deny the claim or a tort to deny

13  the claim or six varieties of breach of contract to deny the

14  claim, the obligor is the plan.  Frequently, the financial

09:43  15  intermediary, since they're paid to administer it, do the

16  court work.  You wouldn't want the plan to have to pay for

17  two sets of lawyers.

18    But there is no claim against the sponsor

19  because the plan didn't pay a benefit.

09:43  20    MR. CATHEY:  The reason that the plan sponsors are

21  here is --

22    THE COURT:  -- is because you sued them.

23    MR. CATHEY:  Well, correct.

24    THE COURT:  They'd rather be elsewhere than --

09:43  25    MR. CATHEY:  The reason they were named in this

1   sense is because most of them, at least without having seen

2   the plans, they would also be the named plan administrator

3   of the plans; and, so --

4         THE COURT:  Why don't you sue the plan?  Just

09:44  5   figure out who it is.

6               Why don't you sue the lawyer who drafted the

7   plan to get him to tell you what -- You don't make parties

8   out of sources of information.

9         MR. CATHEY:  ERISA does not -- as we understand it,

09:44  10  ERISA does not contain an express limitation on the parties

11  that may be named and the Fifth Circuit has said you may see

12  the plan --

13        THE COURT:  Counsel --

14        MR. CATHEY:  Yes, sir.

09:44  15  THE COURT:  -- when you get to the court of appeals

16  of any circuit you choose, you may use that to persuade

17  them.

18        MR. CATHEY:  Okay.

19        THE COURT:  In this case you have sued -- you just

09:44  20  told me you sued people to get discovery.

21        MR. CATHEY:  No, Your Honor.  We sued them upon the

22  best information we had.

23        THE COURT:  Counsel, you just said, well, you

24  didn't have it; so, you want to sue them and find out

09:45  25  whether they're the plan administrator.

1          MR. CATHEY:  No.  That was our understanding --

2          THE COURT:  That's what you said.

3          MR. CATHEY:  Well, I apologize if I was unclear.

4    We are suing on the understanding --

09:45    5          THE COURT:  Unclear?  You were just wrong.

6               Now, counsel, tell me the cause of action --

7    that is, the facts -- that would make American Express

8    Company liable to Humble Surgical Hospital for Fran

9    Johnson's appendectomy.

09:45   10          MR. CATHEY:  To the extent they are the plan

11   administer or exercise actual control over the

12   administration --

13          THE COURT:  They are not individually liable, are

14   they?

09:45   15          MR. CATHEY:  To the extent they exercise control

16   over the plan --

17          THE COURT:  I heard that the first time.

18          MR. CATHEY:  Okay.

19          THE COURT:  You sue the plan.  You don't sue the

09:46   20   employees, their assistants, the contract people they

21   arrange to make the plan work.  It's what the statute says.

22   The plan is a juridical entity, and it's been that way for

23   40 years.

24          MR. CATHEY:  Yes, sir.

09:46   25          THE COURT:  It's in the statute.  Courts of appeals

1   have said, sure, you can sue the financial intermediary if

2   they want to be sued.

3          I actually had a case where the insurance

4   company showed up and said, 'Sure.  We'll just appear for

09:46   5   the plan and everything.'  And then when I ruled against

6   them they appealed on the grounds they weren't the right

7   party to the court of appeals.  I, unfortunately, did not

8   memorialize that appearance in the record.  It was clear,

9   but....

09:47   10          You have no claim against American Express.  I

11   picked it because it's, alphabetically, at the top of the

12   docket list anyway.

13          Anything that was done wrong or not done was

14   done by the plan.  You know nothing that the sponsor did

09:47   15   wrong.  Even if it were a sponsor -- and I have had these

16   cases where a sponsor either just quits paying or goes broke

17   and can't pay and, so, there's a deficiency in the plan with

18   no funds.  That's a failed plan.  That's not a claim against

19   an assignee.  It has to be put in the plan before it's

09:47   20   available for Humble Surgical.

21          You can't tell me what American Express did

22   wrong, can you?  American Express are not sponsors,

23   generally.

24          MR. CATHEY:  We're not suing them, Your Honor, to

09:48   25   make the distinction, as the sponsor per se.  We're suing

1   them to the extent that they're the named plan administrator

2   under ERISA.  And so --

3          THE COURT:  You don't have a claim against the

4   administrator.  You have a claim against the plan.

09:48   5          MR. CATHEY:  But, Your Honor, the complaint --

6          THE COURT:  You have got a fundamental

7   misunderstanding of who parties are.  The parties are the

8   obligor.

9          MR. CATHEY:  If they exercise their discretion.

09:48   10          THE COURT:  I know about that.

11          MR. CATHEY:  Okay.

12          THE COURT:  Your claim in this case is no

13   discretion was exercised, isn't it?

14          MR. CATHEY:  Excuse me?

09:48   15          THE COURT:  Your claim is that no discretion was

16   exercised.

17          MR. CATHEY:  Improperly exercised.  Correct.

18          THE COURT:  What?

19                    (Simultaneous dialogue)

09:49   20          THE COURT:  What did you say?

21          MR. CATHEY:  I said they abused their discretion,

22   Your Honor.

23          THE COURT:  They didn't use their discretion is the

24   essence of the 65-page complaint?

09:49   25          MR. CATHEY:  Yes.

1          THE COURT:  It's still a claim for benefits.  You

2    get the benefit if they abuse their discretion by appealing

3    the denial, don't you?

4          And it says in this complaint that you have

09:49  5    exhausted your remedies because they have been unreasonable

6    or something about a quarter of the way through.  You

7    exhaust a claim for an individual, a person, not for a class

8    of financial injury to a second-level medical service

9    company.

09:50  10         In which instance did American Express abuse

11   its discretion?

12         MR. CATHEY:  With respect to the patient identified

13   in the complaint.  We have attempted to break down on a

14   claim-by-claim basis against American Express and identified

09:50  15   the patient without identifying, you know, specific

16   information about them.

17         THE COURT:  Which paragraph identifies?

18         MR. CATHEY:  It would start on Page 16,

19   paragraph 49, to be specific, Your Honor.

09:51  20         THE COURT:  What does it matter that the plan is

21   self-funded?

22         MR. CATHEY:  In this -- I don't think it

23   necessarily makes a distinction in this case, but it --

24         THE COURT:  Then, don't put it in the complaint.

09:51  25         Tell me about No. 1.  What procedure did he

1   have done?

2   　　　　MR. CATHEY:  Your Honor, we did not bring all of

3   the EOBs and information with us today, but we are prepared

4   to exchange that information as necessary.

09:52  5   　　　　THE COURT:  And have you had an independent medical

6   evaluation of the services provided and the claims

7   submitted?

8   　　　　MR. CATHEY:  My understanding is that we have not,

9   and that was because the claim was not denied for lack of

09:52  10  medical necessity.  I do not think that it is disputed, Your

11  Honor.

12  　　　　THE COURT:  Why was it denied?

13  　　　　MR. CATHEY:  The only thing they have told us is

14  three words, Your Honor.  "Improper claim submission".

09:52  15  　　　　THE COURT:  Okay.  And have you not seen the letter

16  that Aetna sent?

17  　　　　MR. CATHEY:  To whom, Your Honor?

18  　　　　THE COURT:  To the plans, I guess it was.  Well, at

19  least to Humble Surgical.

09:52  20  　　　　MR. SHELY:  Yes, Judge.  A letter was sent to

21  Humble and then, also, a web site was put up for

22  participants and beneficiaries to know the basis for denial

23  of the claims.

24  　　　　THE COURT:  So, Mr. Cathey, have you seen the

09:53  25  letter to your client?

1          MR. CATHEY:  To the extent -- I believe so.

2          THE COURT:  You believe so?  That's the essence of

3     the problem here.

4               Aetna announced that it was not doing business

09:53  5     with this particular out-of-network provider.  Right?

6          MR. CATHEY:  Correct.

7          THE COURT:  And, so, how can Humble have relied on

8     any coverage comments when it was directly and individually,

9     personally notified of its disqualification?  You have about

09:53  10    six versions of detrimental reliance, applied contract,

11    contract in fact, all of which can't vary the terms of the

12    plan, but I will ignore that for a minute.  Tell me where

13    your reliance is.

14         MR. CATHEY:  Your Honor, it's in reliance on their

09:54  15    express statements that coverage would be provided for the

16    specific patient for a specific procedure.

17         THE COURT:  The statement was that is a covered

18    thing.  You say it was Humble Surgical asking?

19         MR. CATHEY:  Yes, sir, as outlined in the

09:54  20    complaint, Your Honor.  We provided that information, the

21    specific patient and the procedure to be provided.

22         THE COURT:  After they had already told you they

23    wouldn't do it?  That's a game that's just too cute.

24              All right.  So, go back and tell me what

09:54  25    American Express did wrong with No. 1.

1          MR. CATHEY:  Your Honor, upon information and

2    belief, as we state in the complaint --

3          THE COURT:  Quit saying that.  You clearly have no

4    direct knowledge of anything in this complaint, do you?  Do

09:55    5    you?

6          MR. CATHEY:  I -- I -- I have direct knowledge, but

7    my knowledge is limited, Your Honor.

8          THE COURT:  What direct knowledge do you have?

9          MR. CATHEY:  The information that our client has

09:55    10   been provided by Aetna.  We have attempted to review all of

11   that information prior to filing this lawsuit.

12         THE COURT:  That's secondary knowledge.  You're

13   reading other people's mail and making conclusions.

14              What's the basis for your information and

09:55    15   belief -- since that means you don't know.  Right?

16         MR. CATHEY:  With certainties, Your Honor.

17         THE COURT:  You don't know.  "Knowing" means you

18   have some precise, reliable data that is real.

19              Just tell me what you feel about American

09:56    20   Express in Patient No. 1.

21         MR. CATHEY:  Based upon industry custom and

22   practice --

23         THE COURT:  (Throwing hands up).  So, rumors about

24   what is standard practice.

09:56    25              Go ahead.

1          MR. CATHEY:  Well, Your Honor, we have attempted to

2    request the plan and they --

3          THE COURT:  I am sorry.  Your ignorance is not a

4    justification for suing American Express.  Is it?

09:56    5          MR. CATHEY:  In this case we feel that -- I mean,

6    to the extent --

7          THE COURT:  You feel, yes.  So, the answer is:

8    You're just assuming because industry practice....

9              Now, tell me what the industry practice is

09:56   10   that American Express followed in this instance.

11         MR. CATHEY:  ERISA provides -- the statute provides

12   that a no-named plan administrator -- if the plan did not

13   name a plan administrator, the plan is administered by

14   default, the employer and the sponsor.

09:57   15         THE COURT:  Whom you have sued as administrator.

16         MR. CATHEY:  Who we have sued as administrator,

17   correct.

18         THE COURT:  Well, that's what one would do.  But

19   you don't know that there's no plan administrator, do you?

09:57   20         MR. CATHEY:  As I have stated, we don't know that

21   with a hundred percent certainty.

22         THE COURT:  How certain are you?  72.3?  13?  No.

23   You're assuming that -- and it's probably statistically

24   true, because most plans are not the size of these.  In most

09:57   25   normal, small companies the sponsor is the administrator, as

1    Mildred in the front office does all that sort of stuff for

2    you.

3              So, you're just assuming from that.  It's not

4    common for American Express to hire professional contractors

09:58    5    to handle claims like this?

6              MR. CATHEY:  There is a distinction, I think, Your

7    Honor, between necessarily them hiring a third-party

8    administrator to assist them and them still being the named

9    plan administrator, Your Honor.

09:58   10              THE COURT:  There is.  That wasn't my question.

11              MR. CATHEY:  Yes, Your Honor.

12              THE COURT:  My question was:  Don't they hire

13    people to do that sort of thing for them?  Sometimes they're

14    named the plan administrator, aren't they?

09:58   15              MR. CATHEY:  Sometimes.

16              THE COURT:  Sometimes it's the executive

17    vice-president and intergalactic chairman for human

18    resources, or somebody, who is named as the plan

19    administrator.  But you just don't know.

09:58   20              So, you could sue the plan, couldn't you?

21              MR. CATHEY:  Yes.

22              THE COURT:  And they have addresses.

23              MR. CATHEY:  Yes.

24              THE COURT:  And I take it you have no contact with

09:59   25    No. 1, your American Express.

| | | |
|---|---|---|
| | 1 | MR. CATHEY:  I personally have not, Your Honor. |
| | 2 | THE COURT:  Well, other than the medical work by |
| | 3 | Humble, neither has your client, about asking him, saying, |
| | 4 | 'By the way, who is the sponsor on your plan?' |
| 09:59 | 5 | MR. CATHEY:  There may have been some |
| | 6 | communications that would be documented in their contact |
| | 7 | production. |
| | 8 | THE COURT:  I, actually, don't recommend that, |
| | 9 | because part of the object of ERISA is to leave the poor |
| 10:00 | 10 | patient alone. |
| | 11 | And what was done on No. 1? |
| | 12 | MR. CATHEY:  As I am looking at this, Your Honor, |
| | 13 | in paragraph 50 we identify it as a sinus surgery. |
| | 14 | THE COURT:  In 50?  Oh.  There it is. |
| 10:01 | 15 | Is there a reason no summons have been |
| | 16 | requested? |
| | 17 | MR. CATHEY:  Mr. Humphrey can more directly address |
| | 18 | the status of that. |
| | 19 | Do you feel more comfortable -- |
| 10:01 | 20 | MR. HUMPHREY:  With the Court's permission. |
| | 21 | THE COURT:  Sure.  I will talk to whoever. |
| | 22 | MR. HUMPHREY:  No specific reason other than that's |
| | 23 | normally our procedure, to serve them with a waiver of |
| | 24 | notice of -- a waiver of summons and ask them to respond and |
| 10:01 | 25 | waive the service of the summons. |

1          THE COURT:  Is that done?

2          MR. HUMPHREY:  Your Honor, we have served all the

3    Defendants with a notice of the complaint, the complaint,

4    the request for the waiver of service.  It's my

10:02    5    understanding, as of yesterday, only one of the 24

6    defendants had actually returned the waiver of service, of

7    the summons.  So, it's our intention to go ahead and get 23

8    summonses and serve those in conformance with the rule.

9          THE COURT:  How much time has elapsed?

10:02    10          MR. HUMPHREY:  I think it's been about 60 days

11    since the complaint was filed, Your Honor.

12          THE COURT:  And nobody has called and said, 'Hang

13    on.  I am going to...'?

14          MR. HUMPHREY:  Yes, Your Honor.  One other party

10:02    15    has called.  American Express in-house counsel requested

16    additional time to respond, Your Honor, which we granted.

17          THE COURT:  Is HCA the people who sent back the

18    waiver --

19          MR. HUMPHREY:  That's my understanding, Your Honor.

10:02    20          THE COURT:  -- and why they're here?

21          And I'm sorry I had to reset this.  You

22    probably thought it was for a holiday party, but, actually,

23    I went into the hospital, and that's against my general

24    principle.

10:03    25                    (Off-the-record commentary)

1          THE COURT:  So, I'm sorry about the reset.

2               I heard that somebody from Exxon showed up.

3          MR. DAVIS:  Yes, Your Honor.

4          THE COURT:  Are you the other --

10:04   5          MR. DAVIS:  Exxon and Entergy.  So, I was --

6    Mr. Shely, I think, is going to represent a lot of the other

7    defendants and has a conflict with Exxon and Entergy.  So,

8    assuming we --

9          THE COURT:  Did you not get the -- I was told

10:04  10   somebody from Exxon showed up at the original date.  That's

11   what brought the whole thing up.

12         MR. DAVIS:  Oh.  Okay.  No.  I am outside counsel

13   for Exxon.

14         THE COURT:  I apologize to whoever showed up,

10:04  15   whoever it may have been.  Apparently, they got tired and

16   didn't come back.

17              Well, except for those, Mr. Humphrey, if

18   Humble is serious, issue the summons and get them served.

19         MR. HUMPHREY:  We'll just see, Your Honor.

10:05  20         THE COURT:  Obviously, the number of parties is

21   slightly distracted, but they all turn on an event and its

22   predicate, which are Aetna's rejection of business tendered

23   by Humble for reasons that involved a very careful exercise

24   of discretion after an extensive experience with Humble

10:05  25   Surgical.  This is the consequence of that decision.  And,

1    so, it seems to me a fairly simple case.  Just some legal

2    theories to apply to the transaction.

3                   Mr. Shely, is there anything you feel

4    compelled to add?

10:06    5              MR. SHELY:  A couple of things, Your Honor.

6                   Happy New Year.

7              THE COURT:  Happy New Year.  Well, did you go scuba

8    diving?

9              MR. SHELY:  No, Judge.  That's usually a summer

10:06   10    thing for me.

11             THE COURT:  You're smarter than I thought.

12             MR. SHELY:  Yes, Judge.  But summer is coming.

13                  Judge, of course, as you indicated, you're

14    very familiar with the history of this case.

10:06   15             THE COURT:  Painfully.

16             MR. SHELY:  "Painfully" was your word.

17             THE COURT:  I am.

18             MR. SHELY:  And I think it's essential that you

19    look at this latest suit by Humble through the prism of

10:07   20    their past conduct before you.  I will hit just a few

21    highlights, Judge, or we'd be here all day.

22                  But this is a situation where Humble, not

23    liking the Court's rulings and changing counsel several

24    times last Christmas -- not the one we just had -- went on

10:07   25    their holiday forum shopping spree and they filed a suit in

 1   Connecticut trying to challenge your ruling regarding the

 2   notice that we just talked about, that 'Here's why Humble's

 3   claims won't be paid, because of its' -- to be blunt, 'its

 4   not-honest billing.'

10:07    5              So, they ran to Connecticut and then they ran

 6   to New Jersey.  And it took me a little while, but we

 7   lassoed the Connecticut case and it's back in front of you,

 8   with apologies, Your Honor.

 9              THE COURT:  Thank you.

10:07   10              MR. SHELY:  And the New Jersey one is still out

11   there.  And then Humble did what it's done.

12              I know Mr. O'Neill has a very fine reputation.

13   This isn't directed to him in any way.  But, by my count,

14   this is the fifth set of lawyers for Humble in two years

10:08   15   here.

16              And as I told you almost a year ago -- I went

17   back and looked it up.  We had a hearing on January 3rd, a

18   year ago, and at that time you indicated, of course, that

19   you had the pending motions for judgment on the accounting

10:08   20   phase of this case, the issue that you determined, and we

21   followed your determination, that we should decide that

22   first.

23              THE COURT:  When we first got together I had

24   already read the original, original, original complaint by

10:08   25   Aetna, but it had a super-fluidity of legal theories, in my

1   humble judgment.  And, so, I said we're going to worry about

2   the accounting and we'll worry about cosmic disharmony and

3   RICO and all that stuff later.  Apparently, it's not later

4   yet.

10:09   5       MR. SHELY:  And that's really the point, Judge.

6   It's not later yet.  And I told you a year ago, Judge, when

7   we had that hearing, that the reason Humble is doing what

8   it's done -- which you have characterized in this case their

9   actions as uniquely recalcitrant.  They, as you know, didn't

10:09   10   produce all the documents that you ordered to be produced.

11   Then they told the Fifth Circuit, on the record, that they

12   had.  Then they came down and changed counsel and said,

13   'Well, there actually is more stuff.'  You ordered them to

14   produce it.  You told them it was the last chance.  They

10:09   15   still didn't do it.

16       And we had a hearing in October of 2013.  And

17   you might recall we put on the lead doctor for Humble on the

18   stand and we determined, a few months before that, that they

19   had these use agreements.  Well, they're fee-splitting with

10:10   20   the owners of Humble, who are the treating physicians, and

21   the referring physicians.  And that's not okay.  They can't

22   split their facility fee with them.  That's what we found

23   out happened.

24       We went in.  We had the next day, or the day

10:10   25   after, a deposition in your jury room and we also -- At the

1    end of that, you ordered them to produce additional

2    documents.

3                And, so, their response on all of that was to

4    run and try to challenge your handling of this case in other

10:10    5    courts.  We came in and said, 'Judge, what are we doing?'

6    So, we have kind of had it on a hold, on pause, while we get

7    the Connecticut case back.

8                We saw that the order found that their libel

9    claim was completely preempted.  I brought that case, Judge,

10:10   10    but there's some work already done on it if you choose to

11    follow it.

12                And, so, now we're back.  And you have

13    indicated that, you know, the Court -- that an order will be

14    coming on what is Phase I, the accounting.

10:11   15                So, what Aetna is requesting that you do here,

16    Judge, with respect to this latest suit filed by Humble, is

17    to stay it and no one is going to be harmed.

18                What they're trying to do is say they need

19    discovery.  You will recall we have produced the plan

10:11   20    documents you ordered us to produce.  We have produced -- I

21    think it's 45 plans for about 16 sponsors.  They have those.

22    They have their claims data.  The motions are pending on the

23    issue of the accounting, and until that issue is resolved

24    the expense and distraction of having to respond to this

10:11   25    latest suit suing 23 plans or plan sponsors or whatever they

1    meant to do should not be allowed to, essentially,

2    end-around your prior order.

3                    Now, you will recall -- and this was

4    Mr. Melon filed a motion for leave to file counterclaims in

10:12   5    the original suit.

6                    THE COURT:  I'm at 24 parties.

7                    MR. SHELY:  Aetna is the 24th, I think, Judge.

8                    THE COURT:  23 plans.

9                    MR. SHELY:  23 plans.

10:12   10                    THE COURT:  So, that's 56.  23 sponsor, 23 plans,

11    and then --

12                    MR. SHELY:  That would be 47.  And I'm sure --

13                    THE COURT:  Just seeing if you're paying attention

14    to --

10:12   15                    MR. SHELY:  -- when this suit was -- math was not

16    my strong suit, Judge -- but, when this suit was filed in

17    December, Humble did their best with what they had to work

18    with to explain to you why this was a different case; and

19    you, of course, issued an order saying this case would be

10:12   20    before you, of course, obviously, related to what we have

21    been dealing with for over two years now.  And you told, at

22    least the last set of lawyers and maybe the set of layers

23    before, that 'We're not starting over.'  'Welcome, but we're

24    not starting over.'

10:13   25                    And what Humble is trying to do here is start

1   over.  They want to talk about other things and try to have

2   discovery and -- This is a well-worn page from the playbook

3   for providers.  When they get caught doing what they're

4   doing, they go sue --

10:13   5        THE COURT:  For reference, you might say it's

6   Groundhog Day.

7        MR. SHELY:  Yes, Judge.  We have been over this.

8   They are attempting to cause disruption for --

9        THE COURT:  For the older people, there's a movie

10:13   10  called that, not just a groundhog.

11       MR. SHELY:  They're attempting to cause disruption

12  in Aetna' business by suing plans and plan sponsors or

13  whatever it is they're intending to do.

14            And with respect to the issue of summons, it

10:13   15  appears highly likely that if this case goes forward -- and,

16  again, we're asking that it be stayed for now -- then my

17  firm would represent a number of the defendants, whether

18  it's 23 or 47, and Mr. Davis is going to represent most of

19  the others.  Mr. Constantine is in for HCA currently.

10:14   20            But that really kind of makes our point,

21  doesn't it, Judge?  Why would we have to have all these

22  parties spending all this money to come down here to have

23  hearings when what we need to do, as you previously

24  indicated, is get the accounting issue handled, and those

10:14   25  motions for judgment and cross-motions are pending?

1         And, really, Humble -- as I said a year ago,

2   Judge, Humble doesn't think you can do anything to them.

3   Humble's principals just figure if they keep changing

4   lawyers and file enough suits then somehow they're going to

10:14   5   escape this.  They have leave to file a counterclaim on file

6   in our original suit.

7         You, under Rule 1, in your discretion, have

8   determined that, before we decide counterclaims and whether

9   we're going to allow those, we are going to handle the

10:15   10   accounting issue.  This latest suit is just their attempt to

11   force that issue.  It's not the order of proceedings that

12   you have laid out, it's not how the parties have operated,

13   and there is really no sense in starting there today.

14         What we should do, respectfully, or what Aetna

10:15   15   is asking you to do is stay this case.  Aetna is here in

16   both of the other cases.  Humble is in all of them.  We can

17   go back to where we started, which was the first case and

18   the accounting in Phase 1.  We're not going to do a do-over.

19   The Court can rule on those issues pending before it and

10:15   20   then we can see where we are and what we need to do, if

21   anything, thereafter.

22         So, that's the relief that we're asking for

23   today to avoid the expense and costs that would be

24   associated with responding to Humble's latest suit and,

10:15   25   again, that relief is especially appropriate given Humble's

1    history before you in this court -- its failure to comply

2    with court orders, its failure to produce the documents you

3    order them to produce, and then, when they didn't like that,

4    they ran around the country trying to escape.

10:16    5             We're all back now.  It's a fresh year.  And

6    what we respectfully ask is that you stay this suit, meaning

7    the one we're here on today, and then, when the Humble

8    accounting is taken care of in the first suit, then we can

9    get back together and decide what else, if anything, we need

10:16    10    to do.

11             THE COURT:  Are there documents about this?

12             MR. SHELY:  I'm sorry, Judge?

13             THE COURT:  There's a dolly with four boxes of

14    documents.

10:16    15             MR. SHELY:  That is probably -- Judge, I am

16    guessing.  That's probably the pleadings from the case that

17    we have been on today as opposed to the third one.  We

18    brought that over.

19             MS. PALERMO:  That's not ours.

10:17    20             MR. SHELY:  Oh.  That's not ours.  I know we were

21    bringing a couple boxes, but I didn't think it was that

22    many.

23             THE COURT:  It arrived yesterday afternoon.  I

24    didn't see who delivered it.

10:17    25                  (Off-the-record discussion)

```
       1          THE COURT:  All right.  Anything else?
       2          MR. SHELY:  Nothing else, unless you have any
       3   questions, Your Honor.
       4          THE COURT:  No, sir.
10:17  5          And, Mr. Davis -- I'm sorry -- do you have
       6   anything now to add?
       7          MR. DAVIS:  No, Your Honor.  I think we can work
       8   out the summons.  We have got a misjoinder of some of the
       9   parties in terms of who the plans and plan sponsors are, but
10:17 10   we can work that out.
      11          THE COURT:  Mr. Cathey, did you tell me that your
      12   client didn't have the plans?
      13          MR. CATHEY:  I believe that's correct, Your Honor.
      14          THE COURT:  I wouldn't put too much faith in that
10:18 15   belief.  Somebody got them for Humble in this litigation.
      16          MR. HUMPHREY:  Yes, Your Honor.  I think what
      17   Mr. Cathey was referring to is the specific plans at issue
      18   for the claims at issue in the new lawsuit.  We haven't been
      19   produced those plans.  But you're correct.  In the existing
10:18 20   lawsuit Aetna has produced copies of plan documents related
      21   to some of the plans at issue in the lawsuit.
      22          THE COURT:  Some of them are bound to overlap.
      23          MR. HUMPHREY:  You're correct, Your Honor.  There
      24   probably is overlap.  I don't think we have done a complete
10:18 25   inventory of that.
```

1       THE COURT:  So, you don't need them because you may

2  have them.

3       MR. HUMPHREY:  I know there are some of the plans

4  we do not have.  Correct, Your Honor; there's probably some

10:18  5  overlap.

6       MR. SHELY:  Judge, you might recall that your order

7  to produce certain plans was also tied to we were doing a

8  sampling of original claims; so, we boiled it down into

9  certain claims, and the parties chose claims that they like

10:19  10  and the plans were in connection with that.

11       THE COURT:  Now that you have reminded me, I

12  remember it, but I would not have recalled it --

13       MR. SHELY:  Then, I apologize, Judge.

14       THE COURT:  No.  That's all right.  But I do that a

10:19  15  lot when you have many things.  I even had a case where a

16  bend in a pipeline, the weld, had ruptured.

17            (Off-the-record commentary)

18       THE COURT:  All right.  To the extent that you all

19  are conversant with the parties and some of these may be

10:20  20  misnomers, if you could just help clear that up.

21            Mr. Cathey, anything else you want to add this

22  morning?

23       MR. CATHEY:  Not me personally, Your Honor.

24       THE COURT:  How about you?

10:21  25       MR. HUMPHREY:  No, Your Honor.

```
 1              THE COURT:  Mr. Humphrey?

 2              MR. HUMPHREY:  No, Your Honor.

 3              THE COURT:  Palermo, anything you want?

 4              MS. PALERMO:  No, sir.

 5              THE COURT:  Mr. Pidcock?

 6              MR. PIDCOCK:  No, Your Honor.

 7              THE COURT:  Does HCA want to say anything at this

 8    point?

 9              MR. CONSTANTINE:  May I approach, Your Honor?

10              THE COURT:  Yes, sir.

11              MR. CONSTANTINE:  Good morning, Judge.

12              THE COURT:  Good morning.

13              MR. CONSTANTINE:  Your Honor, the only thing that I

14    would do is -- I'm not familiar with the prior lawsuits,

15    obviously, but my impression is that resolution of those

16    prior lawsuits might go a long way if not completely toward

17    resolving this lawsuit, and I would just like to support the

18    idea that this lawsuit should be stayed.  It seems like my

19    client is going to be forced to spend an awful lot of money

20    defending a lawsuit that really would be disposed of were

21    the earlier lawsuits resolved first.  So, that just seems to

22    make good sense, and it would save my client an awful lot of

23    money.

24              The other thing that I would add in terms of

25    my client spending a lot of money -- I don't understand the
```

1    current -- I mean, they have sued a bunch of ERISA plans.

2    We all understand preemption.  Preemption has been around

3    for the 40 years that ERISA has been around.  And we're

4    going to end up spending a lot of money arguing about HCA

10:23    5    not being the plan administrator, we're going to spend a lot

6    of money arguing about preemption, and that's just not

7    necessary, Judge, and we shouldn't be forced to incur that

8    kind of an expense.

9            And I would note one other thing, Your Honor.

10:23    10    The plan administrators are identified in Form 5500s.  Those

11    are all public record.  And what that tells me is that there

12    was almost no --

13        THE COURT:  I do a lot of them.  They're a public

14    record.

10:23    15        MR. CONSTANTINE:  So, that tells me, Judge, that

16    there was no diligence exercised in filing this complaint

17    against my client; and, you know, we're going to pay the

18    price for that, and I don't think that that's appropriate

19    Your Honor.

10:23    20            So, I think the stay makes awfully good sense

21    and would resolve --

22        THE COURT:  If you want to find out who the plan

23    administrator is you could sue the plan, as an absolute

24    minimum effort.

10:24    25        MR. CONSTANTINE:  Absolutely, Your Honor.

1      THE COURT:  Somebody will answer.

2      MR. CONSTANTINE:  And, obviously, we -- And Your

3  Honor's very first question, whether they intended to sue

4  both the plan and the plan sponsor was an important

10:24  5  question.  You can't tell from the complaint.  And when we

6  went to acknowledge, you know, to sign our waivers, there

7  was only one party listed.  I actually had to manually

8  through the CM/ECF system -- I had to manually add a second

9  party because I wasn't sure if they had sued one party or

10:24  10  two parties.

11      THE COURT:  The way it was constructed and the way

12  it was entered in the computer, it's 24 parties.

13      MR. CONSTANTINE:  Correct.  And I, out of an excess

14  of caution -- obviously, I didn't want to ignore the

10:24  15  ambiguity in the complaint, Your Honor.

16          So, anyway, that's all I would add, Judge.

17      THE COURT:  And that was additional time you had to

18  spend that you shouldn't have had to spend.

19      MR. CONSTANTINE:  Of course.  And, again,

10:24  20  additional expense that my client had to incur.

21          Thank you, Judge.

22      THE COURT:  You're not doing these things pro bono.

23      MR. CONSTANTINE:  Your Honor, we actually do handle

24  a fair number of pro bono cases.  This is not one of them.

10:25  25      THE COURT:  Mr. Constantine, I've found in the

1  practice of law not only did I do pro bono cases, but cases

2  I didn't think were pro bono turned out to be pro bono; and

3  that was one of the most disappointing things in the

4  practice, was perform a miracle and get stiffed.

10:25  5        MR. CONSTANTINE:  I understand.  I won't admit

6  publicly having done that, Judge, but absolutely....

7        THE COURT:  Lawyers need to get paid.

8             And since we're dealing with doctors here, you

9  all are subjected to lots of sneers at cocktail parties and

10:25  10  things about your absence of contribution to the well-being

11  of the world.  Without an independent bar there would be no

12  science.  It would be the prerogative of the government and

13  the church, which seem to be not only ahistorical

14  institutions but anti-scientific institutions.  And you

10:26  15  could remind them, of course, that while your professional

16  forefathers were writing the Constitution theirs were

17  putting leeches on George Washington.

18             I had a doctor tell me at a party that he

19  didn't register to vote because he didn't want to be on jury

10:26  20  duty.

21             And I said, "Well, good."

22             And he was surprised and said, "What do you

23  mean 'good'?"

24             I said, "I don't want a weasel like you voting

10:26  25  or being on a jury.  That's awful."

1          That's why I don't get out much.

2          All right.

3          Mr. Cathey.

4     MR. CONSTANTINE:  Thank you, Judge.

10:26   5     MR. CATHEY:  The only thing I would have to add,

6  Your Honor, was he mentioned the Form 5500s.  We have

7  reviewed all of the Form 5500s, and I believe the caption in

8  the complaint, at least, accurately reflects the names that

9  we pulled off the form.

10:27   10     THE COURT:  Why did you say you needed discovery to

11  know who the administrators were?

12     MR. CATHEY:  Well, to the extent they wanted to

13  dispute that, Your Honor.  We thought we --

14     THE COURT:  Don't imagine disputes.  You have got

10:27   15  enough dispute from what you have said in here.

16          Look.  Real litigation is not a game.  It's

17  about genuinely disputed facts after a reasonable

18  investigation.  They'll tell you in plenty of time if

19  they're disputed.  They have to.  They've got to speak up or

10:27   20  lose that claim.  So, you don't need to worry about it.

21          You don't need to annoy anybody, but what you

22  do need is to make a thorough investigation to start with,

23  which the public disclosures, I have always found, are a

24  good place to start.  And now, because we feared young

10:28   25  people were lazy and not very bright, we have invented all

1    these nifty processes where you can get it online without

2    ever leaving the beach.

3              She's smiling because she knows where she does

4    her legal research.

10:28   5         So, that's not a problem.  The case has

6    serious problems.  That's not one of them.  So, you need to

7    focus on the real problem.

8              All right.  I will get something done.  Thank

9    you.

10

11                   COURT REPORTER'S CERTIFICATE

12         I, BRUCE SLAVIN, certify that the foregoing is a

13   correct transcript from the record of proceedings in the

14   above entitled matter, to the best of my ability.

15

16                             *s/Bruce Slavin*
                               BRUCE SLAVIN, RPR, CMR

17

18

19

20

21

22

23

24

25